UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Orwa Ali Al-Saadoon and Farok Abdulmajid Hamod, | Case No. 12-cv-2949 (PAM/TNL) |
| Petitioners, | |
| v. | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER OF JUDGMENT** |
| Eric J. Holder, Jr., Janet Napolitano, Alejandro Mayorkas, and Sharon V. Dooley, | |
| Respondents. | |

_____

1. This matter is before the Court on Farok Abdulmajid Hamod's and Orwa Ali Al-Saadoon's requests for de novo review of the United States Citizenship and Immigration Services' denials of their naturalization applications. For the reasons that follow, the Court affirms the denials.

**FINDINGS OF FACT**

2. Hamod and Al-Saadoon are natives and citizens of Iraq. (Govt. Ex. 33.) They are also married and have six children. (Govt. Ex. 32.)

3. Hamod is an accomplished and respected Sheikh and Islamic scholar. He serves the community by, among other things, leading religious ceremonies, offering spiritual counseling, and publishing academic works.

4. Al-Saadoon is a caring mother and wife.

5. On August 11, 1998, Al-Amal School filed an I-129 Petition for Nonimmigrant Worker on Hamod's behalf. (Govt. Ex. 2.) Al-Amal School sought to have Hamod provide it with religious worker services on a temporary basis. (Id.)

6. On September 15, 1998, Immigration and Naturalization Service, the predecessor to USCIS, granted the petition and approved a nonimmigrant visa for Hamod that was valid from September 14, 1998 to September 5, 2001. (Govt. Ex. 2.)

7. On June 23, 1999, Hamod entered the United States as a nonimmigrant religious worker. (Govt. Ex. 5.)

8. On August 6, 1999, Al-Amal School filed an I-360 Petition for Special Immigrant Religious Worker on Hamod's behalf. (Govt. Ex. 3.) Al-Amal School sought to have Hamod provide it with religious worker services on a permanent basis. (Id.)

9. On December 29, 1999, INS denied the petition because Al-Amal School failed to establish that it was a 501(c)(3) tax-exempt organization and was therefore not an organization qualified to file a visa petition for a religious worker. (Govt. Ex. 4, at 3.)

10. On August 2, 2000, the Islamic Cultural Community Center filed an I-360 Petition for Special Immigrant Religious Worker on Hamod's behalf. (Govt. Ex. 5.) The ICCC sought to have Hamod serve as its Imam on a permanent basis. (Govt. Ex. 8, at 1.)

11. In support of the petition, counsel for the ICCC submitted a letter dated September 26, 2000, which enclosed a letter from the ICCC stating that Hamod had "been working [there] in a religious capacity since he arrived in Minnesota in 1999." (Govt. Ex. 6.) Specifically, the enclosed letter from the ICCC, dated "Minneapolis [sic] 26, 2000," states: "[Hamod] has been helping the ICCC in various capacities. Since his arrival in the Twin Cities, [Hamod] has been . . . leading prayers . . . giving weekly lectures . . . advising and counseling . . . conducting marriage ceremonies . . . [and]

holding seminars . . . ." (Govt. Ex. 8, at 2-3.) The letter further states: "We are also thankful to Al-Amal School for allowing [Hamod] provide his needed services to the ICCC and the Muslim community." (Id. at 3.)

12.     Hamod himself submitted a letter in support of the petition, also dated "Minneapolis [sic] 26, 2000," in which he wrote: "When I arrived in American in 6/24/1999, I devoted many of my efforts to serve the Muslim community in Minnesota. In fact, since my arrival I lead Muslims in their daily prayers at various Mosques. I also deliver Islamic lectures [and] participated, by invitation, in social and religious activities with Muslims in Detroit, Chicago, and Los Angeles." (Govt. Ex. 7, ¶ 9.)

13.     Finally, Al-Amal School submitted a letter, dated September 25, 2000, in support of the petition. (Govt. Ex. 9.) The letter states: "Al-Amal School initially employed [Hamod] as a religious teacher in June 1999 pursuant to an R-1 visa. He later became the Religious Curriculum Director at the school." (Id.) The letter goes on to describe Hamod's duties at Al-Amal School. (Id.) Those duties are different than the duties the ICCC and Hamod detailed in their letters dated "Minneapolis [sic] 26, 2000." (Govt. Exs. 7-9.)

14.     On December 8, 2000, INS granted the petition and approved an immigrant visa for Hamod. (Govt. Ex. 5.)

15.     On June 20, 2001, Hamod filed an I-485 Application to Adjust Status based on his immigrant visa. (Govt. Ex. 10.) On June 21, 2001, Al-Saadoon, being Hamod's wife, also filed an I-485 Application to Adjust Status as a derivative beneficiary of

Hamod's immigrant visa. (Govt. Ex. 34.) They sought to become lawful permanent residents. (Id.)

16. In support of the applications, the ICCC submitted a letter dated June 20, 2001. (Govt. Ex. 11.) The letter states that the ICCC "offered Dr. Hamod a permanent employment in the position of Imam at a salary of no less than $54,000 per year." (Id.) The letter further describes Hamod's duties at the ICCC, which were substantially similar to the duties described in the ICCC's letter dated "Minneapolis [sic] 26, 2000." (Govt. Exs. 8, 11.)

17. On August 21, 2002, INS granted the applications, and Hamod and Al-Saadoon then adjusted to permanent residence status. (Govt. Exs. 10, 13, 34, 35.)

18. On July 11, 2007, Hamod and Al-Saadoon each filed an N-400 Application for Naturalization. (Govt. Exs. 14, 36.) With those applications, they sought to become U.S. citizens. (Id.)

19. In Part 6 of Hamod's naturalization application, captioned "Information About Your Residence and Employment," subsection B asks: "Where have you worked . . . during the last five years?" (Govt. Ex. 14, at 3.) Hamod responded that he was employed at the ICCC from "7-15-2000" to the present. (Id.) He signed the application "under penalty of perjury under the laws of the United States of America." (Id. at 10.)

20. In response to a Request for Evidence by USCIS, Hamod submitted a letter from the ICCC, dated April 20, 2009, which states: "This is to certify that Dr. Farok

Hamod is working for The Islamic Cultural Community Center as president and Imam for this organization since 2000 until now. Upon his request, we issued this letter." (Govt. Ex. 15.) Hamod also submitted a letter from the ICCC, dated June 22, 2010, which states: "[Hamod] has been with the ICCC – Al Huda since 2000." (Govt. Ex. 16.)

21. On October 27, 2010, a USCIS officer interviewed Hamod in connection with his naturalization application. (Govt. Ex. 18.) Hamod was represented by counsel and an interpreter was provided. (Id. at 2:5-9; 3:12-17.) Hamod was sworn in and gave oral testimony. (Id. at 3:21 to 4:1, 5:19-21.) The officer asked Hamod about his work at the ICCC, and particularly: "How long have you been employed at the ICCC?" (Id. at 12:18.) He responded: "Since 2000." (Id. at 12:19.)

22. On November 22, 2010, USCIS denied Hamod's naturalization application because he lacked good moral character. (Govt. Ex. 19.)

23. On July 27, 2010, a USCIS officer interviewed Al-Saadoon in connection with her naturalization application. (Govt. Ex. 36.)

24. On November 22, 2010, USCIS denied Al-Saadoon's naturalization application because she lacked good moral character. (Govt. Ex. 37.)

25. On December 17, 2010, Hamod administratively appealed the denial of his naturalization application. (Govt. Ex. 21.)

26. On December 8, 2011, a USCIS officer interviewed Hamod in connection with his administrative appeal. (Govt. Ex. 22.) Hamod was represented by counsel and an interpreter was provided. (Id. at 2:8-13.) Hamod was sworn in and gave oral

testimony. (Id. at 3:10-13, 5:8.) The officer asked Hamod when he started working for the ICCC. (Id. at 11:14.) He responded: "2000." (Id. at 11:15.) He later testified that he began working at Al-Amal School in 1999 and was employed by them for "less than a year," at which time he started working for the ICCC. (Id. at 55:20 to 56:8.) He reiterated that he started working for the ICCC in 2000. (Id. at 56:9-13.) He agreed that when he entered the United States, "he had a visa to work at Al-Amal School . . . but then [he] changed and [he] started working with ICCC." (Id. at 62:13-18.) His counsel agreed that Al-Amal School and the ICCC are two separate entities. (Id. at 66:5-7; 66:21-22; 67:2; 69:11.)

27. On August 16, 2012, USCIS affirmed its denial of Hamod's naturalization application because he was not lawfully admitted to permanent residence status and because he lacked good moral character. (Govt. Ex. 23.)

28. On December 17, 2010, Al-Saadoon administratively appealed the denial of her naturalization application. (Govt. Ex. 38.)

29. On December 1, 2011, a USCIS officer interviewed Al-Saadoon in connection with her administrative appeal. (Govt. Ex. 39.)

30. On August 16, 2012, USCIS affirmed its denial of Al-Saadoon's naturalization application because she was not lawfully admitted to permanent residence status given that she derived her immigration status from Hamod, who was not lawfully admitted, and because she lacked good moral character. (Govt. Ex. 40.)

31.     On November 26, 2012, Hamod and Al-Saadoon filed individual actions for de novo review of USCIS's denials of their naturalization applications. Because Al-Saadoon's eligibility to naturalize depends on Hamod's, as she is a derivative beneficiary of him and thus whether she was lawfully admitted for permanent residence status depends on whether he was, the Court consolidated the two actions.

32.     On June 4, 2013, Hamod gave sworn testimony at his pretrial deposition in this case. (Govt. Ex. 31.) He could not recall when he became involved with the ICCC or how long he had been in the United States before he became involved with the ICCC. (Id. at 23:5-11.) But he did testify that he had no reason to doubt his testimony during his administrative appeal hearing that he had been employed at the ICCC since 2000. (Id. at 24:7-11.) And he testified that he was working as an Imam and preacher at the ICCC in April 2000. (Id. at 25:23-25.) He did not recall whether he was still working for Al-Amal School at that time. (Id. at 26:1-3.) He agreed that the ICCC and Al-Amal School are two separate entities. (Id. at 32:4-14.) He also agreed that he "provided services" for the ICCC during the period from September 14, 1998 to August 6, 2001. (Id. at 34:8-10.)

33.     On October 15 and 16, 2014, the Court held a hearing to review USCIS's denials of Hamod's and Al-Saadoon's naturalization applications.

**CONCLUSIONS OF LAW**

34.     When USCIS denies a naturalization application, the applicant may seek judicial review of the denial under 8 U.S.C. § 1421(c).

35. Section 1421(c) permits the district court to conduct a de novo review of USCIS's denial of a naturalization application:

> A person whose application for naturalization under this subchapter is denied, after a hearing before an immigration officer under section 1447(a) of this Title, may seek review of such denial before the United States district court in the district in which such person resides. . . . Such review shall be de novo, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing de novo on the application.

8 U.S.C. § 1421(c).

36. To be eligible for naturalization, an applicant must meet the following requirements:

> (1) immediately preceding the date of filing his application for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years and during the five years immediately preceding the date of filing his application has been physically present therein for periods totaling at least half of that time, and who has resided within the State or within the district of the Service in the United States in which the applicant filed the application for at least three months;
>
> (2) has resided continuously within the United States from the date of the application up to the time of admission to citizenship; and
>
> (3) during all the periods referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States.

8 U.S.C. § 1427(a).

37. The applicant "bear[s] the burden of establishing by a preponderance of the evidence that he or she meets all of the requirements for naturalization." 8 C.F.R. § 316.2(b). As the Supreme Court has emphatically declared: "it has been universally

8

accepted that the burden is on the alien applicant to show his eligibility for citizenship in every respect." INS v. Pangilinan, 486 U.S. 875, 886 (1988) (citation and quotation marks omitted).

38.   The Supreme Court has also commanded that the applicant must strictly comply with all of the statutory mandates to attain citizenship. See Fedorenko v. United States, 449 U.S. 490, 506 (1981) (confirming that "there must be strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship"); Berenyi v. Dist. Dir., INS, 385 U.S. 630, 637 (1967) (instructing that "no alien has the slightest right to naturalization unless all statutory requirements are complied with").  Indeed, the Supreme Court has warned that "[a]n alien who seeks political rights as a member of this Nation can rightfully obtain them only upon the terms and conditions specified by Congress," and "[c]ourts are without authority to sanction changes or modifications; their duty is rigidly to enforce the legislative will in respect of a matter so vital to the public welfare." Fedorenko, 449 U.S. at 518 (citation and quotation marks omitted).

39.   As explained above, one of the requirements for naturalization is that the applicant must have resided continuously within the United States for five years after having been "lawfully admitted for permanent residence." 8 U.S.C. § 1427(a)(1). The term "lawfully admitted for permanent residence" means "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." 8 U.S.C. § 1101(a)(20).

40. An alien who was admitted as a nonimmigrant religious worker, 8 U.S.C. § 1101(a)(15)(R), and then adjusted his or her status to that of special immigrant religious worker, 8 U.S.C. § 1101(a)(27)(C), may apply to be admitted for permanent residence status. 8 U.S.C. §§ 1154(a)(1)(G), 1255(a).

41. But an alien who "accepts unauthorized employment prior to filing an application for adjustment of status . . . or who otherwise violated the terms of a nonimmigrant visa" may not be admitted to permanent residence status. 8 U.S.C. § 1255(c).

42. Expanding on what constitutes "unauthorized employment," the regulations in effect when Hamod was approved as a nonimmigrant religious worker provide that a nonimmigrant religious worker may only work for the specific religious organization that was authorized to engage his or her services. See 8 C.F.R. §§ 214.2(r)(3)(ii)(E), 274a.12(b)(16) (providing that "the following classes of non-immigrant aliens are authorized to be employed in the United States by the specific employer and subject to the restrictions . . . indicated as a condition of their admission: . . . alien having a religious occupation, pursuant to § 214.2(r) of this chapter"), 214.1(e) (1999) (providing that a "nonimmigrant who is permitted to engage in employment may only engage in such employment as has been authorized").

43. If a different religious organization wants to engage the nonimmigrant religious worker's services, the organization must file a new petition and obtain that authorization. See 8 C.F.R. § 214.2(r)(6) (1999) (providing that "[a] different or

additional organizational unit of the religious denomination seeking to employ or engage the services of a religious worker admitted under this section shall file a Form I-129 with the appropriate fee"). The different religious organization must file the petition regardless of whether it seeks to formally employ or simply "engage the services" of the nonimmigrant religious worker. Id.

44. To constitute unauthorized employment, the services to the different religious organization need not be compensated. See Camphill Software v. INS, 381 F.3d 143, 150 (3d Cir. 2004) (rejecting the argument that a "religious occupation" for purposes of implementing religious-worker provisions under 8 U.S.C. § 1101(a) must be a salaried position); 56 Fed. Reg. 66,965 (Dec. 27, 1991) (noting that in promulgating the final version of 8 C.F.R. § 214.2(r), the agency stated that the rule had been "revised to account more clearly for uncompensated volunteers, whose services are engaged but who are not technically employees").

45. If the different religious organization does not file a new petition and the nonimmigrant religious worker provides services to the organization, those services constitute unauthorized employment and bar the applicant from being admitted to permanent residence status. See id. (providing that "any unauthorized changes to a new religious organization will constitute failure to maintain status"); 8 C.F.R. § 214.1(e) (providing that a "nonimmigrant who is permitted to engage in employment may only engage in such employment as has been authorized" and "[a]ny unauthorized employment by a non-immigrant constitutes failure to maintain status").

46. In sum, if a nonimmigrant religious worker provides paid or volunteer services for a different religious organization than that authorized to engage his or her services and the different religious organization does not file a new petition and obtain authorization, those services constitute unauthorized employment and bar the applicant from being admitted to permanent residence status. If the applicant was admitted, the admission was unlawful and renders the applicant ineligible for naturalization.

47. A derivative beneficiary, like a spouse, of an applicant for naturalization shares the same immigration status as the primary beneficiary relative for purposes of his or her naturalization application. 8 U.S.C. § 1153(d).

48. The Court concludes that Hamod was unlawfully admitted to permanent residence status because he engaged in unauthorized employment by working for the ICCC when he was authorized to work only for Al-Amal School and because the ICCC did not file a new petition and obtain authorization for that work.

49. As found above, Hamod's nonimmigrant visa authorized him to provide religious worker services from September 14, 1998 to September 5, 2001 only for Al-Amal School. But the record plainly reflects that Hamod engaged in unauthorized employment during part of that period for the ICCC. The ICCC is a different religious organization than Al-Amal School. The following evidence shows that Hamod provided religious worker services to the ICCC starting at least in early to mid-2000: the ICCC's and Hamod's letters in support of the ICCC's special-immigrant-religious-worker petition, the ICCC's letter in support of Hamod's status-adjustment application, Hamod's

answers on his naturalization application, the ICCC's two letters in support of Hamod's naturalization application, and Hamod's sworn testimony during his naturalization-application and administrative-appeal interviews and his pretrial deposition.

50. At trial, Hamod testified that all of the evidence showing that he provided religious worker services for the ICCC starting in 2000 was "mistaken." Given the overwhelming evidence to the contrary—including Hamod's own prior statements—the Court does not find his testimony on this subject to be credible.

51. Further, even if some of Hamod's religious worker services to the ICCC starting in 2000 were voluntary and not paid, which Hamod admits, the Court concludes that, as discussed above, those services constitute unauthorized employment.

52. Additionally, the ICCC did not previously file a new petition to authorize that employment until August 2000 and did not obtain authorization until December 2000, several months after Hamod began providing religious worker services for the ICCC.

53. Once the Court has determined that an applicant does not qualify for naturalization, it "has no discretion to ignore the defect and grant citizenship." Fedorenko, 449 U.S. at 517 (citation and quotation marks omitted).

54. Because Hamod technically engaged in unauthorized employment while on a nonimmigrant visa and thus was unlawfully admitted to permanent residence status, the Court is bound to conclude that he is therefore ineligible for naturalization.

55. Having concluded that Hamod may not naturalize because he was unlawfully admitted to permanent residence status, the Court need not and will not address whether Hamod alternatively may not naturalize because he lacks good moral character.

56. Since Al-Saadoon was admitted to permanent residence status as a derivative beneficiary of Hamod, she was unlawfully admitted and is likewise ineligible for naturalization.

**ORDER OF JUDGMENT**

57. Neither Hamod nor Al-Saadoon are eligible to naturalize because they were not lawfully admitted to permanent residence status. Accordingly, **IT IS HEREBY ORDERED** that USCIS's denials of Hamod's and Al-Saadoon's naturalization applications are **AFFIRMED**.

Dated: October 21, 2014

*s/ Paul A. Magnuson*
Paul A. Magnuson
United States District Court Judge